IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RANDI LYNN HAINES, | ) | CASE NO.  4:24-CV-00228-JRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Randi Lynn Haines ("Plaintiff" or "Haines"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In December 2021, Haines filed applications for DIB and SSI, alleging a disability onset date of December 12, 2021, and claiming she was disabled due to anxiety, depression, epilepsy, fibromyalgia, polycystic ovarian syndrome ("PCOS"), endometriosis, cotton wool spots in eyes, a swollen ankle, a neck injury from a car accident, and pain from a previously broken back. (Transcript ("Tr.") 17, 257.) The

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

applications were denied initially and upon reconsideration, and Haines requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 17.)

On April 24, 2023, an ALJ held a hearing, during which Haines, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*.) On May 17, 2023, the ALJ issued a written decision finding Haines was not disabled. (*Id.* at 17-28.) The ALJ's decision became final on December 18, 2023, when the Appeals Council declined further review. (*Id*. at 1-6.)

On February 6, 2024, Haines filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 8-9.) Haines asserts the following assignments of error:

(1)    The ALJ erred when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

(2)    The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistency and limiting effects of Plaintiff's symptoms, including pain and difficulty using her hands, precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(3)    The ALJ erred and his decision was not supported by substantial evidence when he failed to properly evaluate the opinions of the treating source in accordance with 20 CFR 404.1520c and 416.920c.

(Doc. No. 6 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Haines was born in 1987 and was 35 years-old at the time of her administrative hearing (Tr. 26), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a college education. (Tr. 26.) She has past relevant work as a title clerk, a customer service representative, and a counter clerk. (*Id*.)

2

**B.      Relevant Medical Evidence[2]**

On December 27, 2020, Haines underwent an x-ray of her sacrum/coccyx, which revealed a closed fracture. (*See* Tr. 372.) On January 14, 2021, a follow up x-ray indicated the fracture was healing. (*Id*.) On February 25, 2021, Haines had another follow up x-ray, but the provider was "not convinced that there [was] any progressive healing since the study of 14 January 2021." (*Id*. at 371.)

On January 8, 2021, Haines sought treatment for ongoing daytime fatigue and sleep disturbances. (*Id*. at 362-66.) After Haines participated in a sleep study, her treatment provider, Dr. Michael Lileas, found no signs of obstructive sleep apnea or hypoxia but noted the underlying possibility of narcolepsy. (*Id*.) Due to cotton-wool spots in her vision and elevated blood pressure, he suggested she determine the cause of the cotton-wool spots prior to any further testing for narcolepsy. (*Id*. at 366.) Dr. Lileas also discussed weight loss, caution with driving, and operating heavy machinery with Haines. (*Id*. at 373.)

On June 10, 2021, Haines underwent a transthoracic echocardiogram. (*Id*. at 356-58.) The echocardiogram was unremarkable except for "[p]hysiologic and/or trace mitral regurgitation." (*Id*. at 357.)

On August 29, 2021, Haines underwent a CT scan of her head. (*Id*. at 386-88.) No abnormalities were detected other than "mucosal thickening in the right maxillary sinus." (*Id*. at 387.)

During a gynecological visit on August 24, 2021, Haines reported ongoing cramping and dysmenorrhea. (*Id*. at 498.) She said it began in November 2020 and had gotten worse. (*Id*.) Keri Speicher, APRN-CNP, noted Haines was "extremely frustrated and tired" and her "mood [was] worsening." (*Id*.)

On September 8, 2021, Haines underwent an x-ray to diagnose her left ankle pain (*Id*. at 388.) No fracture or dislocation was evident, nor was any evidence of bone or joint abnormality. (*Id*.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

Two days later, on September 10, 2021, Haines visited Aleksandra Rachitskaya, M.D., at Cleveland Clinic Ophthalmology for evaluation of cotton-wool spots in her vision. (*Id*. at 335.) She reported the spots "wax and wane" and change in location. (*Id*.) On examination, treatment providers found macular ischemia, cotton wool spots, and atrophy in both eyes. (*Id*. at 338-341.) During follow up appointments on February 16, 2022 and July 29, 2022, Haines reported stable vision with no new developments. (*Id*. at 626, 644.)

Haines reported "doing well" during an anti-anxiety medication refill appointment on October 8, 2021, demonstrating a normal mood, cooperation, and demeanor, with good insight and judgment. (*Id*. at 389-93.)

On October 13, 2021, Haines underwent laparoscopic surgery to address her ongoing dysmenorrhea, the results of which confirmed the presence of endometriosis. (*Id*. at 396.) Following surgery, she attended physical therapy sessions from October to December 2021 for management of her pelvic and perineal pain. (*Id*. at 407-84.) Joanna Schnell, PT, noted Haines appeared "motivated," while observing demonstrated deficits in pain levels, functional activity tolerance, and ability to stand for extended periods of time. (*Id*. at 422, 477.) Schnell recommended continued therapy, noting Haines's positive rehabilitation potential and progress towards set goals. (*Id*.) Haines expressed a desire to resume therapy after undergoing treatment for ongoing neck pain. (*Id*. at 407, 486.) Haines reported continued pelvic pain and cramping during a September 13, 2022 gynecological visit with Jennifer Baird, M.D. (*Id*. at 613.)  In November 2022, Haines underwent a hysterectomy for her endometriosis, pelvic pain, and dysmenorrhea. (*Id*. at 601.)

From January to March 2022, Haines received regular treatment by Thomas E. Gudaitis, D.C., for injuries sustained in an automobile accident on December 16, 2021. (*Id*. at 537-86.) Her complaints included neck and upper back pain, as well as headaches, which were described as "sharp, aching, and throbbing." (*Id*. at 537.) Her self-reported discomfort levels ranged from 5 to 7 out of 10. (*Id*. at 550, 552, 554, 556.) Movement exacerbated her symptoms and the pain remained consistent. (*Id*. at 537.) Treatment consisted

4

of chiropractic manipulation and personalized therapeutic exercise to improve strength, flexibility, and range of motion. (*Id*. at 551, 552, 554, 556.) At a subsequent visit, Haines reported ongoing pain but said she felt "much better" than when she first started. (*Id*. at 558.)

On January 17, 2022, Haines completed a Function Report detailing her health challenges. (*Id*. at 264-71.) She reported severe pain from fibromyalgia, neck pain, and migraines, as well as anxiety. (*Id*. at 264.) She indicated the cotton wool spots in her eyes caused her vision to blur, which made a regular job difficult. (*Id*.) She also mentioned ongoing pain from her broken sacrum as well as cramping from PCOS and endometriosis. (*Id*.) She said she slept "very little" because of the amount of pain she was in, noting a sleep doctor would not help her due to her eye issues. (*Id*. at 265.) While she could independently dress and bathe, it took her extra time. (*Id*.) She used reminders on her phone for medication. (*Id*. at 266.) She managed some light household cleaning, though she found tasks like laundry challenging because of the weight of the basket and discomfort with bending. (*Id*.) She avoided driving due to pain but was able to handle her finances independently. (*Id*. at 267.) She had trouble concentrating due to the headaches and pain and acknowledged challenges with accomplishing tasks. (*Id*. at 269.) Stress led her to develop heart palpitations, panic attacks, and increased blood pressure. (*Id*. at 270.) She reported her anxiety had resulted in a grand mal seizure at her last place of employment, and she had since suffered from memory and spelling issues. (*Id.* at 271.)

On May 20, 2022, Haines saw James Tanley, Ph.D., for a consultative mental examination. (*Id*. at 588.) Haines reported her anxiety causes her heart rate will increase, and she will get palpitations and heartburn. (*Id*.) She had not seen a mental health provider in 10 years, but she takes Paxil. (*Id*.) Haines told Dr. Tanley she constantly worries, but that her medication "takes off the edge." (*Id*.) She reported doing "pretty well" with others, but her prior job affected her mental health too much and so she quit. (*Id*. at 589.) She told Dr. Tanley she had been working part-time for a staffing agency for the past month. (*Id*.) Haines

reported doing chores depending on the day. (*Id.*) She might work from 9:00 a.m. to 1:00 p.m. (*Id.*) She and her husband own a small toy store. (*Id.*) She likes art, and she cuts vinyl and makes things with resin. (*Id.*) She reported watching television "here and there," listening to the radio, reading, and using the internet. (*Id.* at 589-90.)

On examination, Dr. Tanley found Haines cooperative and coherent, without symptoms of anhedonia, mood swings, inflated self-esteem, or grandiosity. (*Id.* at 590.) Haines demonstrated appropriate thought content and good eye contact, and she did not cry during the examination. (*Id.*) She recalled six digits forward and three backward. (*Id.*) She "quickly and flawlessly" counted backwards and recited the alphabet, although she made one mistake on serial three addition. (*Id.*) She recalled three out of three items after five minutes with interference. (*Id.*) Dr. Tanley diagnosed Haines with generalized anxiety disorder. (*Id.* at 591.) Dr. Tanley found no impairment in Haines's ability to understand, remember, and follow instructions. (*Id.* at 592.) Dr. Tanley did not observe limitations in Haines's attention or concentration but stated that "[w]ere her anxiety problems to worsen, they could negatively impact this domain by interfering with her ability to focus and to concentrate." (*Id.*) While Haines reported doing "pretty well" with people and demonstrated "an unremarkable social presentation" during the examination, Dr. Tanley opined Haines "would likely have a bit of difficulty" in responding appropriately to supervision and coworkers in a work setting "since she would be working too hard to please others." (*Id.*) As Haines reported leaving two jobs because of stress, Dr. Tanley further opined that Haines's "current anxiety problems could lower her frustration tolerance and put her at some degree of risk for the pressures of work." (*Id.*)

On June 4, 2022, Haines began bi-weekly counseling sessions with Kristin Macala, MSEd, LPCC, CCTP, CSOTP, to address her generalized anxiety. (*Id.* at 594.) On June 27, 2022, Macala completed a Mental Impairment Questionnaire and reported Haines struggled with managing anxiety, which physically manifested in hives, seizures, nausea, dizziness, and general physical decompensation. (*Id.*) Macala opined

6

Haines was seriously limited (but not precluded) from maintaining attention and concentration for extended periods, adhering to a schedule, managing attendance, and sustaining an ordinary routine without supervision. (*Id*.) Macala further opined Haines was unable to meet competitive standards of completing a normal workday without interruption and performing at a consistent pace without an unreasonable number of rest periods. (*Id*.) She found Haines limited but satisfactory in her ability to remember locations, interact appropriately with the general public, ask simple questions, accept instruction from supervisors, get along with coworkers without distracting them, and maintain socially appropriate behavior. (*Id*. at 595.) Macala further opined Haines was seriously limited (but not precluded) from understanding and remembering instructions and responding appropriately to changes in the work setting. (*Id*.) She further opined Haines would be absent from work three days per week and would be off task five out of eight hours in a workday. (*Id*.) In subsequent counseling sessions, Macala noted Haines was "doing well," learning adaptive coping skills for anxiety, and addressing irrational thought processes through self-regulation techniques. (*Id*. at 658.)

C.      **State Agency Reports**

        1.      **Mental Impairments**

On June 7, 2022, Rena Pompa, Ph.D., reviewed the file and opined Haines had no limitation in her abilities to understand, remember, or apply information and concentrate, persist, or maintain pace, and mild limitations in her ability to interact with others and adapt or manage herself. (*Id*. at 85, 95.) Dr. Pompa opined there was no evidence to suggest a severe mental impairment. (*Id*.)

On July 29, 2022, on reconsideration, David Dietz, PhD., affirmed Dr. Pompa's findings. (*Id*. at 106, 115.)

### 2. Physical Impairments

On April 21, 2022, W. Scott Bolz, M.D., reviewed the file and opined Haines could occasionally lift and/or carry upwards of 20 pounds and frequently lift and/or carry upwards of ten pounds. (*Id*. at 87-88, 97-98.) She could stand and/or walk for a total of six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (*Id*. at 87, 97.) She could frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id*.) She could frequently balance and occasionally stoop, kneel, crouch, and crawl. (*Id*.) She had no manipulative limitations. (*Id*.) She was to avoid all hazards, including dangerous machinery and unprotected heights. (*Id*. at 88, 98.)

On August 5, 2022, on reconsideration, Elizabeth Das, M.D., affirmed Dr. Bolz's findings. (*Id*. at 108-09, 117-18.)

### D. Hearing Testimony

During the April 24, 2023, hearing, Haines testified to the following:

- She continues to have problems with her lower back after breaking it, finding it difficult to get up and down. (*Id*. at 51-52.) Her fibromyalgia is a major source of physical pain for her as well. (*Id*. at 52.) She described the sensation in her hands and fingers as feeling "like there's concrete drying in them," so she has a difficult time manipulating them. (*Id*. at 53.) She has pain wherever there is a joint. (*Id*.) Two previous car accidents caused whiplash to her neck, but she had to stop chiropractic treatments because of her insurance. (*Id.* at 54.) She often drops items such as glasses and pans. (*Id*.) She uses speech-to-text, so she does not have to type anything. (*Id.* at 55.) She struggles with writing. (*Id*.) She can get dressed but needs help with buttons. (*Id*.)

- Her hysterectomy has helped "some," although she continues to experience pelvic floor issues and pelvic pain. (*Id*. at 56-57.) Her cotton wool spots have shown improvement, but they can still sometimes be painful. (*Id*. at 58.) She broke her left foot last year and deals with swelling, which she tries to alleviate by elevating her foot. (*Id*. at 58-59.) She suffers from panic attacks and attributes the development of epilepsy to her stress levels. (*Id*. at 60.) She developed fibromyalgia after experiencing a seizure at her previous job. (*Id*.) She has "micro seizures" that she tries to manage by staying calm and finding a quiet place to work through them. (*Id*. at 60-61.)

Her seizures have improved since she stopped working, although they are stress-dependent and still occur about once a week. (*Id*. at 61.)

•   She has trouble concentrating and tends to ruminate. (*Id*.) While she gets along with others, she struggles with motivation due to her pain. (*Id*. at 62.) Counseling and medication are beneficial to her. (*Id*.) She has trouble sleeping but manages to perform small household tasks and run errands during the day. (*Id*. at 63.) When anxious, she develops hives, experiences acid reflux, and will lose her train of thought. (*Id*. at 67-68.)

The VE testified Haines had past work as a title clerk, customer service representative, and counter clerk. (*Id*. at 71.) The ALJ then posed the following hypothetical question:

> For my first hypothetical, I'd like you to consider an individual of the same age, educational background, and work experience as the claimant. I'd like you to presume the individual can perform the full range of light work subject to the following limitations: Assume that the individual would be limited to frequent handling or fingering. The individual could occasionally climb ramps or stairs, but would never climb ladders, ropes, or scaffolds. The individual would be limited to frequent balancing, stooping, kneeling, crouching, or crawling. The individual could never be exposed to unprotected heights, hazardous machinery, or commercial driving. The individual would be limited to the performance of simple, routine tasks and simple, work-related decisions and limited to occasional interactions – I'm sorry – frequent interactions with supervisors, coworkers, or the general public. The individual would tolerate few changes in a routine work setting. Could such an individual perform work the claimant?

(*Id*. at 71-72.)

The VE testified the hypothetical individual would not be able to perform any of Haines's past work but would be able to perform other representative jobs in the economy, such as inspector/packer, mail clerk, and garment folder. (*Id*. at 72.) The ALJ modified the hypothetical to add the limitations of occasional fingering or handling and the ability to elevate legs to waist level for one hour per workday. (*Id*. at 73.) The VE testified there would be no jobs in the competitive workforce this individual could perform. (*Id*.) The ALJ then inquired if work existed in the national economy if the individual is off task 20% of the time and absent three days per month. (*Id*.) The VE testified it did not. (*Id*.) Haines's attorney inquired if competitive work would be available if the individual is having difficulty staying on task and the employer had to

occasionally redirect the individual. (*Id*. at 74.) The VE testified that would be more of an accommodation. (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Haines was insured on the alleged disability onset date, December 12, 2021, and remains insured through December 31, 2026, the date last insured ("DLI"). (Tr. 17, 19.) Therefore, to be entitled to POD and DIB, Haines must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2. The claimant has not engaged in substantial gainful activity since December 12, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3. The claimant has the following severe impairments: obesity, fibromyalgia syndrome, endometriosis, degenerative disc disease of the lumbar spine, bilateral cotton wool spotting/macular atrophy, generalized anxiety disorder, attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

11

404.1567(b) and 416.967(b) except with the following additional limitations. The claimant can frequently handle and finger. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. The claimant can frequently balance, stoop, kneel, crouch, and crawl. The claimant cannot work near unprotected heights or hazardous machinery. The claimant cannot perform any commercial driving. The claimant is limited to simple, routine tasks and can make simple, work-related decisions. The claimant can tolerate frequent interactions with coworkers, supervisors, and the public. The claimant can tolerate few changes in a routine work setting.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May **, 1987 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 12, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-28.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).

Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

13

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

## A.  Fibromyalgia and Endometriosis

In Haines's first assignment of error, she argues the ALJ failed to properly apply the criteria of Social Security Ruling 96-8p and consider all her impairments and related limitations stemming from her fibromyalgia and endometriosis when forming the RFC. (Doc. No. 6 at 8.) She points out that despite acknowledging her pain, the ALJ continued to note her ability to walk independently. (*Id.* at 8.) Citing SSR 12-2p, which states the ALJ should consider a "longitudinal record whenever possible as the symptoms of fibromyalgia can wax and wane," Haines argues the ALJ failed to discuss her other symptoms related to her fibromyalgia and endometriosis other than including a limitation to frequent handling and fingering because of hand stiffness. (*Id.* at 8-9.) Haines asserts the ALJ's failure to consider her other fibromyalgia and endometriosis symptoms was contrary to SSR-96-8p, and the ALJ's determination was not supported by substantial evidence. (*Id.* at 9.)

In response, the Commissioner argues that while the record documents Haines's fibromyalgia, it lacks any significant associated complaints, treatments, or findings. (Doc. No. 8 at 6.) The Commissioner argues that despite this, the ALJ still accounted for Haines's fibromyalgia-related stiffness in her hands by

incorporating manipulative limitations into the RFC. (*Id.*) The Commissioner notes that the ALJ considered the ongoing impact of Haines's endometriosis pain, as the ALJ acknowledged records indicating physical therapy provided some relief. (*Id.*) The Commissioner maintains that Haines' argument that "'the ALJ failed to provide sufficient basis for meaningful judicial review with no logical bridge'" is based on a standard originating out of the Seventh Circuit, and the Seventh Circuit "recently clarified" that "the 'logical bridge' language is merely 'shorthand' for saying, the ALJ's explanation 'must be sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review.'" (Doc. No. 8 at 7) (quoting *Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024) (internal quotation omitted)). The Commissioner argues that "because the ALJ's explanation was sufficient to allow this court to assess the validity of the ALJ's findings, Plaintiff's argument should be rejected and the Court should affirm the ALJ's decision." (Doc. No. 8 at 7.)

Social Security Ruling 12-2p sets forth the agency's policy in the evaluation of fibromyalgia and explains that fibromyalgia is a common and complex medical condition "characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues." SSR 12-2p also provides the criteria for determining whether a claimant has a Medically Determinable Impairment ("MDI") of fibromyalgia. After finding fibromyalgia to be a severe impairment, the regulation provides that the ALJ will evaluate a claimant's statements using the same credibility analysis for evaluating an individual's symptoms under any MDI,[3] which requires the ALJ:

> [C]onsider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms….[and] As we explain in [SSR 16-3p], we will make a finding about the credibility of the person's statements…

---

[3] SSR 12-2p refers to SSR 96-7p's two-step criteria for making credibility determinations.  SSR 96-7p was superseded by SSR 16-3p on March 28, 2016.

SSR 12-2p (July 25, 2012).

Though the same factors are applied to fibromyalgia as to any MDI, caselaw demonstrates that "[t]he nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis." *Cooper v. Comm'r of Soc. Sec.*, No. 4:13-CV-11883, 2014 WL 4606010, at *23 (E.D. Mich. June 17, 2014), *report and recommendation adopted*, No. 13-11883, 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014). Because of this, courts have found that the ALJ should not overemphasize any one factor and the ALJ must also "consider a longitudinal record…because the symptoms of fibromyalgia can wax and wane…" SSR 12-2p at *6. In interpreting caselaw in this area, it is important to note that "there is a significant distinction between failing to find a severe impairment at step two, and failing to find disability at step five." *Cooper v. Comm'r of Soc. Sec.*, No. 4:13-CV-11883, 2014 WL 4606010, at *19 (E.D. Mich. June 17, 2014), *report and recommendation adopted.*, No. 13-11883, 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014) (emphasis added); *see also Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012) (noting the "important distinction between, on one hand, diagnosing fibromyalgia and finding it to be a severe impairment and, on the other, assessing a claimant's physical limitations due to the impairment").[4]

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

---

[4] Here, the ALJ found fibromyalgia qualified as a severe impairment at Step Two. Thus, the fibromyalgia cases on point are those that involve an assessment of physical limitations due to fibromyalgia. These cases demonstrate that the ALJ's credibility finding is crucial. *James v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-1915, 2023 WL 4172932, at **14-15 (N.D. Ohio June 5, 2023). As Haines raises a separate subjective symptom challenge, the Court discusses the ALJ's subjective symptom determination *infra*.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable

light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

At Step Two, the ALJ found Haines' fibromyalgia and endometriosis to be severe impairments. (Tr. 20.) In the RFC analysis, the ALJ further found as follows:

> The claimant presents with diagnoses for fibromyalgia and endometriosis, both of which appear to contribute to diffuse pain in the absence of clear etiology. As discussed with the claimant's cervical sprain, the motor vehicle accident of December 16, 2021 appears to have triggered chronic pain in the claimant (6F7). She developed a lot of tenderness in her back and joints, muscle spasms, and hypermobility after that accident, in the absence of say clear injury to the neck or spinal cord overall (6F7). The development of endometriosis complications have followed a similar pattern, subsequent to the birth of the claimant's now toddler-aged child. She has reported pelvic floor pain and dysfunction and increased abdominal cramping (4F7). A biopsy has been positive for endometriosis tissue, dating to October 13, 2021 (5F9). However, for these issues of joint pain, abdominal pain, and cramping, the received treatment has been conservative, largely consisting of physical therapy (see generally 4F). Those physical therapy records generally reflect the claimant reporting such improved her pain and dysfunction levels (4F4). Records generally show that despite pain, the claimant's muscle strength and ability to walk independently have remained intact (e.g., 4F8). I have taken into consideration the claimant's reports of stiffness in the hands due to fibromyalgia, in finding that she can frequently handle and finger, and cannot climb ladders, ropes, or scaffolds due to the required grip strength for such.

(*Id*. at 23.)

While the ALJ gave some weight to the opinions of the state agency consultants, he found greater restrictions necessary given her fibromyalgia:

> Their overall finding of limitation to light exertion is consistent with a record that shows the claimant is able to walk independently, has not

experienced any marked strength loss, and generally has received conservative treatment for complaints of pain. However, I find these two opinions have not fully considered the complications of fibromyalgia in that they do not address the complaints of stiffness in the hands, leading to the dropping of items. Thus, I find some greater restriction is warranted concerning the ability to handle and finger objects, and climb ladders, ropes, and scaffolds.

(*Id*. at 25.)

In restricting Haines to never climbing ladders, ropes, or scaffolds, and only frequently handing or fingering, the ALJ set forth a more restrictive RFC than any medical source in the record suggested. *See Carver v. Saul*, No. 3:20-CV-00051, 2020 WL 8458801, at *15 (N.D. Ohio Oct. 5, 2020) ("[S]ignificantly, the record contains no medical opinion of greater limitations than those that the administrative law judge included in her RFC determination.").

The ALJ provided a thorough and detailed analysis to support the greater restrictions within the RFC. The ALJ specifically considered Haines's fibromyalgia, as well as her pelvic floor pain, dysfunction, and increased abdominal cramping from her endometriosis, in assessing her RFC. (Tr. 23.) The ALJ found Haines's treatment had been largely "conservative," consisting mainly of physical therapy, which resulted in improved pain and dysfunction levels. (*Id*. at 23, 25.)[5] The ALJ determined that despite the ongoing pain, she had maintained muscle strength and ability to walk independently (*id.*) – considerations that were proper and supported by the evidence. *James v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-1915, 2023 WL 4172932, at *16 (N.D. Ohio June 5, 2023). Haines points to no examinations demonstrating functional limitations. "Even fibromyalgia" requires "sufficient objective evidence" regarding impairment of "functional abilities." *Ross v. Saul*, 5:19-CV-485-REW, 2020 WL 7634160, at *7 (E.D. Ky. Dec. 22, 2020) (citing and quoting SSR 12-2p).

---

[5] The Court notes Haines underwent a hysterectomy for her endometriosis and dysmenorrhea. However, Haines fails to raise a specific challenge to the ALJ's decision with respect to her hysterectomy. (Doc. No. 6.) Assuming, *arguendo*, Haines had raised such a challenge, the Court finds a sufficient basis for the ALJ's RFC determination even though treatment for Haines's endometriosis was not conservative.

As the ALJ built a logical bridge between the evidence and his decision, there is no reversible error.

**B.      Subjective Symptom Analysis**

In her second assignment of error, Haines asserts the ALJ failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of her symptoms, including pain and difficulty using her hands, precluded her from engaging in substantial gainful activity on a full-time and sustained basis. (Doc. No. 6 at 11.) She maintains it is "clear" she satisfied the criteria set forth in Ruling 16-3p, and her disabling symptoms interfere with her ability to engage in daily living activities. (*Id.* at 17.) Haines asserts the ALJ "erroneously opined" that her statements were not entirely consistent with the medical evidence, as he based his conclusion on her ability to stand and walk independently despite her primary problem with her hands. (*Id.* at 14-15.) Haines asserts the ALJ made no mention of the difficulties she experienced with her hands and fingers other than placing a restriction on frequent handling and fingering. (*Id.* at 15.) She argues that "[i]t is unclear in this matter whether the ALJ considered all the evidence when completing his pain analysis." (*Id.* at 16.)

The Commissioner responds that substantial evidence supports the ALJ's subjective symptom determination. (Doc. No. 8 at 7.) The Commissioner asserts that, contrary to Haines's argument, the ALJ noted Haines's allegations regarding limitations in her hands, including her tendency to drop things, and accounted for them in forming the RFC. (*Id.* at 8.) In addition, the Commissioner points out the record is devoid of evidence of hand pain or dysfunction outside of Haines's testimony. (*Id.*) Regarding Haines's mental impairments, the Commissioner maintains the ALJ considered her daily activities, hobbies, testimony about her panic attacks, and mental health treatment records. (*Id.* at 8-9.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental

20

impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). *See also* SSR 16-3p,[6] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[7] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2016 WL

---

[6] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the April 24, 2023 hearing.

[7] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[8] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Despite difficulties in applying a traditional credibility analysis, in assessing the physical limitations of fibromyalgia, a diagnosis alone "does not automatically entitle [a claimant] to disability benefits[.]" *Vance*, 260 F. App'x at 806. As the Sixth Circuit has explained, "[s]ome people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority.") *Id.* (quoting *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996); *see also Bush v. Astrue*, No. 2:07–CV–257, 2009 WL 311121, at *15 (E.D. Tenn. Feb. 6, 2009) (Stating in the fibromyalgia context, "[I]t is the functional limitations imposed by a condition, not just a diagnosis of the condition, that determines disability."). The Sixth Circuit has also explained that, in the fibromyalgia context, "because credibility is particularly relevant in the absence of sufficient objective medical evidence, the courts will generally defer to the Commissioner's assessment of credibility when it is supported by an adequate basis." *Blair v. Comm'r of Soc. Sec.,* 430 F. App'x 426, 430 (6th Cir.2011). *See also Cocke v. Colvin*, 2014 WL 798158, at *2 (W.D. Ky 2014) (noting unique nature of fibromyalgia requires heightened focus on credibility factors); *Wines v. Comm'r of Soc. Sec.,* 268 F.Supp.2d 954, 958, 960–61 (N.D. Ohio 2003) (stating that the absence of objective evidence in fibromyalgia cases "places a premium ... on the assessment of the claimant's credibility."). "Credibility determinations regarding the applicant's subjective

---

[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

complaints rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence." *Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. 2014). A reviewing court should not disturb an ALJ's credibility finding absent "compelling reasons." *Smith v. Commissioner*, 307 F.3d 377, 379 (6th Cir. 2001); *Jones v. Commissioner*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying").

Here, the ALJ acknowledged Haines's testimony about her hands and other statements regarding her symptoms and limitations. (Tr. 20-26.) The ALJ determined Haines's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id*. at 23.) However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record because the objective evidence suggests Haines is capable of greater functioning than alleged. (*Id*.) Specifically, the ALJ found as follows:

> The claimant presents with diagnoses for fibromyalgia and endometriosis, both of which appear to contribute to diffuse pain in the absence of clear etiology. As discussed with the claimant's cervical sprain, the motor vehicle accident of December 16, 2021, appears to have triggered chronic pain in the claimant (6F7). She developed a lot of tenderness in her back and joints, muscle spasms, and hypermobility after that accident, in the absence of say clear injury to the neck or spinal cord overall (6F7). The development of endometriosis complications has followed a similar pattern, subsequent to the birth of the claimant's now toddler-aged child. She has reported pelvic floor pain and dysfunction and increased abdominal cramping (4F7). A biopsy has been positive for endometriosis tissue, dating to October 13, 2021 (5F9). However, for these issues of joint pain, abdominal pain, and cramping, the received treatment has been conservative, largely consisting of physical therapy (see generally 4F). Those physical therapy records generally reflect the claimant reporting such improved her pain and dysfunction level(4F4). Records generally show that despite pain, the claimant's muscle strength and ability to walk independently have remained intact (e.g., 4F8). I have taken into consideration the claimant's reports of stiffness in the hands due to fibromyalgia, in finding that she can frequently handle and finger, and cannot climb ladders, ropes, or scaffolds due to the required grip strength for such.

In terms of lower back pain, again I have considered the history of sacral fracture in my finding of the claimant's residual functional capacity. X-rays of the lumbar spine dated December 27,2020 showed only minimal, diffuse spurring, being a largely unremarkable finding (3F33).While these findings do represent significant change compared to an unimpaired spine, the shown scope and degree of these degenerative changes is rather mild, and does not strongly correlate with the pain levels the claimant has alleged, nor with her claims of having serious difficulties rising from a seated position, sitting for long periods, and or standing for long periods. The claimant is not a candidate for surgery on the lumbar vertebra. She has not received any intensive treatments to address lower back pain outside of physical therapy.

Underlying all of the claimant's physical impairments, I note that she is obese. Records generally show the claimant's body mass index [BMI] has been in the high 30s to low 40s since the alleged onset date (5F7, 3F19). This high body weight might reasonably make worse existing issues of joint and lower back pain. However, I again note that the claimant has shown ability to stand and walk independently and has not received any truly intensive treatments to address musculoskeletal dysfunction. Thus, even when considering complications of obesity, I find the claimant can sustain the somewhat reduced range of light work as described in Finding 5 above.

In terms of the cotton wool spots in the claimant's eyes, the record documents in frequent treatment for and occurrence of such. Dating back to September 2021, this impairment was noted in both eyes, but was not indicated to be causing serious disruption of her visual acuity(2F3-6). The claimant did not receive much if any treatment for this condition from September2021 until a serious of follow up appointments in early 2022 (10F25). Those appointments noted that the cotton wool spots had improved, and that the claimant's visual acuity was stable(10F25). This treatment history is inconsistent with the claimant's testimony that she experiences black spots in her vision with some frequency, at least in terms of marked reduction in her ability to see her environment. Accordingly, I find that the preclusion of commercial driving, and work near unprotected heights and hazardous machinery reasonably accounts for the symptoms of cotton wool spots in the claimant's eyes.

In terms of symptoms of anxiety and depression, the record documents only some mild to moderate complication. Prior to the May 20, 2022, consultative examination, the claimant denied any treatment for these conditions (7F3). Per her hearing testimony, she now receives counseling biweekly, and does take some psychotropic medications (hearing testimony). The record does reflect an opinion statement from a counselor, so these claims generally are corroborated, but there are limited records of the content of those counseling sessions. Thus, the best source of evidence concerning the claimant's mental health comes from the May 2022

consultative examination. At that appointment, the claimant reported that she enjoys making art, helps her husband with a small toy shop, goes to garage sales, and makes items with resin (7F3). These prior statements indicate greater daily activities and engagement in enjoyable hobbies than the claimant otherwise indicated in her hearing testimony (7F3). During the evaluation in question, the claimant was polite, cooperative, and displayed no signs of eccentric behavior(7F4). She maintained good eye contact with the examiner, suggesting intact concentration(7F4). The claimant's energy levels were noted to be unremarkable, and she reported no crying spells or suicidal thoughts (7F4). The claimant generally presented with signs of at least average intelligence (7F4). She performed well at measures of recent and remote memory recall (7F4). She did make one error at serial three subtractions but was able to count backwards and recall the alphabet without error (7F4). Thus, it appears she has no more than some moderate deficit in concentration and task persistence (7F4). I do take note that the claimant reported a history of quitting jobs and or being terminated from such due to anxiety and inability to cope with stress. These are situations that would not have manifested in objective documentation in the medical record. That said, I note that while the claimant reports suffering from semi-regular panic attacks, such symptoms of anxiety are rarely mentioned in the medical record. Thus, there is little to no basis to conclude the claimant is markedly limited in say stress tolerances due to panic attacks.

Ultimately, I find the claimant is limited to simple, routine tasks and can make simple, work-related decisions, given the noted signs of at least average intelligence, intact memory, and fair concentration and task persistence from the May 2022 consultative examination (7F4). The claimant can tolerate frequent interactions with coworkers, supervisors, and the public as the record documents no altercations with others or tendency towards irritability. The claimant can tolerate few changes in a routine work setting, taking into consideration her persistent reports of struggle to cope with stress and pressures at past jobs (hearing testimony).

(*Id*. at 23-25.)

Substantial evidence supports the ALJ's assessment of Haines's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Haines's allegations of disabling conditions. (*Id*. at 20-26.) The ALJ considered Haines's allegations of pain, as well as her statements regarding manipulation, fingering, hand stiffness, and her ability to handle objects. (*Id*. at 23, 25). Contrary to Haines's allegations, the ALJ credited some of her symptoms but did not accept them to the extent alleged because the record evidence suggested she was capable of a greater functioning than alleged. (*Id*.)

Furthermore, the ALJ's extensive discussion of the relevant medical evidence included reported improvement in pain with treatment, only mild degenerative changes in the lumbar spine, reported stability with Haines's cotton wool spots, and statements suggesting greater daily activities and engagement in enjoyable hobbies than Haines otherwise indicated. (*Id*. at 20-26.) Haines's mental health record indicated ongoing anxiety management through medication and counseling, with one therapist noting she was "doing well." (*Id*. at 391, 658.) The ALJ also considered Haines's panic attacks but noted such symptoms "[we]re rarely mentioned" in the medical record.  (*Id.* at 24.)  The ALJ also determined Haines's history of quitting jobs or being terminated from job due to anxiety and inability to cope with stress would have manifested in objective documentation in the medical record. (*Id*.)

The Court is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision, and the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

There is no error.

## C.      Medical Opinion Evidence

In her final assignment of error, Haines argues the ALJ's decision lacked substantial evidence when he failed to properly evaluate the opinions of Kristen Macala, L.P.C., in accordance with 20 CFR 404.1520(c) and 416.920(c). (*See* Doc. No. 6 at 18-19.) Haines implies the ALJ erred because he relied on Dr. Tanley's report to "refute" Macala's opinion, but "Dr. Tanley had opined that Plaintiff's anxiety problems could lower her frustration tolerance and affect her ability to handle the pressures of work."  (*Id.* at 20) (citation omitted).  Therefore, Haines argues, the ALJ's rationale for not including the limitations in Macala's opinion "was contrary to the evidence in this matter and was not supported by the ALJ's statements and/or substantial evidence." (*Id.*) (citing *Russ v. Comm'r of Soc. Sec.*, No. 1:20cv1838, 2021 WL 3709916,

at *9 (N.D. Ohio Aug. 20, 2021).  Haines also maintains the ALJ "offered an inadequate analysis as required by *Russ* and failed to proffer a coherent explanation as required by *Lester*, at *10." (Doc. No. 6 at 21.)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of the medical opinion evidence. (Doc. No. 8 at 9.) The Commissioner asserts that the ALJ found Macala's opinion unpersuasive because Macala failed to provide any supporting rationale and it was inconsistent with Haines's treatment history and self-reported activities. (*Id.* at 10.) While Haines argues Macala's opinion was consistent with that of Dr. Tanley, the ALJ found Dr. Tanley's opinion somewhat persuasive and incorporated mental limitations into the RFC to accommodate a reduced stress tolerance. (*Id.*) The ALJ explained how he considered Dr. Tanley's opinion. (*Id.*) The Commissioner argues that Haines is "unsatisfied" with the ALJ's explanation and asks the Court "to reweigh this evidence in her favor." (*Id.*)

In her reply brief, Haines asserts the ALJ failed to discuss the supportability and consistency of Macala's opinion. (Doc. No. 9 at 1.) She argues that the physical manifestations of her anxiety made her unable to meet competitive standards of completing a normal workday and performing at a consistent pace without an unreasonable number of length and rest periods. (*Id.* at 1-2.) Because the ALJ failed to review the evidence which supported the opinion of the treating source, Haines alleges the ALJ committed harmful error. (*Id.* at 3.) Haines also accuses the Commissioner of provided *post hoc* rationalizations to establish support for the ALJ's "unsupported and inconsistent conclusions." (*Id.*)

Since Haines's claims were filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings,

27

including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[9] (2) consistency;[10] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

---

[9] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[10] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed and weighed Macala's opinion as follows:

I find little persuasive effect in the opinion of Kristyn Macala, who stated the claimant is unable to meet competitive standards in terms of completing a normal workweek free of interruption from mental health symptoms and is unable to meet competitive standards in terms of working at a consistent pace without an unreasonable number of rest periods (8F1). Ms. Macala also stated will be absent from work three days per week and would be off task five hours in a typical workday (8F2). Ms. Macala's statements concerning time off task and absenteeism are not supported by any specific explanation or citation to specific, causal symptoms. Her conclusions are inconsistent with the conservative nature of the claimant's treatment for

29

> anxiety and ADHD symptoms. Her opinion also is inconsistent with some
> of the claimant's prior statements made at the May 2022 consultative
> examination, wherein the claimant reported helping her husband run a small
> toy shop and reported greater hobby activities than otherwise reported
> during the hearing (7F3).

(Tr. 26.)

The ALJ found weighed and analyzed Dr. Tanley's opinion as follows:

> I find some persuasive effect in the opinion of consultative examiner Dr.
> James C. Tanley Ph.D., who stated the claimant may experience difficulty
> in focus and concentration if her anxiety problems worsen and may
> experience lowered tolerance for frustration due to anxiety (7F6). Dr.
> Tanley's opinion is supported by his observations and examination of the
> claimant in May 2022. That said, the language of his opinion statement is
> vague, and does not provide guidance beyond the believed presence of
> severe mental health impairments. Thus, I find only some persuasiveness in
> his assessment when it comes to the claimant's specific residual functional
> capacity.

(*Id*. at 25.)

Supportability and consistency are the most important factors under the new regulations for

evaluating medical source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ considered the

supportability and consistency of Macala's opinion, noting discrepancies with other evidence in the medical

record. (*Id*. at 25-26.) He found Macala's opinion unsupported due to a lack of supporting rationale and

failure to connect the findings to Haines's treatment history. (*Id*. at 26, 594-95.) The ALJ also found

Macala's opinion inconsistent with statements Haines made to Dr. Tanley, including that she helped her

husband run a toy shop and reported greater hobbies than she testified to at the hearing.  (*Id*. at 26.)  As the

Commissioner points out, the ALJ explained that Dr. Tanley's opinion "was supported by his observations

and examination" of Haines, but the language of his opinion statement was vague and failed to provide

"guidance beyond the believed presence of severe mental health impairments." (*Id*. at 25.)  Therefore, there

is no inconsistency in the weight assigned to the opinions of Macala and Dr. Tanley.

Moreover, in rejecting Macala's opinion and determining Haines's RFC, the ALJ noted that prior to the May 20, 2022 consultation with Dr. Tanley, Haines denied any treatment for her anxiety and depression. (*Id.* at 24.) While Haines testified to biweekly counseling, the content of those treatment records was limited. (*Id.*)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Haines would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: August 15, 2024                                   *s/ Jonathan Greenberg*
                                                        Jonathan D. Greenberg
                                                        United States Magistrate Judge

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**